UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GENE AND FRANCES CANNON, *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) Case No. 3:06-0804 |
| v. | ) Judge Trauger |
| | ) |
| GUNNALLEN FINANCIAL, INC., *et al.*, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM

Pending before the court is the Motion to Dismiss and to Compel Arbitration filed by the defendants (Docket No. 22), to which the plaintiffs have responded (Docket No. 31), the defendants have replied (Docket No. 35), and the plaintiffs have filed a surreply (Docket No. 38). For the reasons discussed herein, the defendant's motion will be stayed pending the court's receipt of further information from the parties.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

All of the claims in this case stem from the plaintiffs' dealings with P. Michael Tansil, a stockbroker who, when the plaintiffs first encountered him, was a registered representative of GunnAllen Financial. (*See* Docket No. 15 at 3.) According to the plaintiffs, Tansil "invested plaintiffs' assets in an unsuitable and excessively risky fashion and engaged in excessive and unnecessary trading." (*Id.*) In addition, they allege that "Tansil conducted trading in plaintiffs' accounts during a period of time in which it was not lawful for him to engage in the securities

1

business in the state of Tennessee." (*Id.*)  The plaintiffs also assert that GunnAllen Financial, which hired Tansil in 2002 following his termination by First Union Securities, never informed the plaintiffs that Tansil had previously been terminated or that he continued to be the subject of "numerous customer claims."  (*See id.* at 3-4.)  They also claim that, "[d]uring Mr. Tansil's employment with GunnAllen Financial, GunnAllen Financial failed to supervise his activities in the diligent manner required by the rules and regulations of the National Association of Securities Dealers (NASD) and other securities agencies."  (*Id.* at 4.)

In August 2005, the New York Stock Exchange Division of Enforcement ("NYSE") filed a number of charges against Tansil based on his allegedly improper dealings with clients.  (*See id.*)  Soon thereafter, GunnAllen Financial represented to the NASD that it had terminated its relationship with Tansil on August 26, 2005 due to his acts of "product misrepresentation."  (*See id.*)  As a result of this termination, assert the plaintiffs, Tansil was no longer legally permitted to transact business as a securities agent in Tennessee.  (*See id.*)

The plaintiffs claim that, despite this fact, Tansil continued to manage and make trades in their accounts.  (*See id.* at 5.)  They also allege that both Tansil and GunnAllen failed to disclose to them Tansil's termination and the pending NYSE charges against him.  (*See id.*)

In addition to Tansil and GunnAllen Financial, the plaintiffs have made claims against (1) GunnAllen Holdings, a Florida corporation that, according to the plaintiffs, owned one hundred percent of GunnAllen Financial during the time relevant to this case; (2) Richard Frueh, a Florida resident who, during the time relevant to this case, was GunnAllen Financial's chairman and chief executive officer; (3) Mark Ellis, a Florida resident who, since July 2005, has been GunnAllen Financial's chief compliance officer; (4) Richard Nummi, a Florida resident who, until July 2005, was GunnAllen Financial's chief compliance officer; and (5) Stephen

Saunders, a Florida resident who, from January 2002 to August 2005, was Tansil's direct supervisor. (*See id.* at 2-3.)

The defendants have moved to dismiss all of the plaintiffs' claims and to compel the claims to arbitration pursuant to the plaintiffs' arbitration agreements. (*See* Docket No. 22 at 1.) They also assert that "[a]ll of Plaintiffs' claims against Defendants GunnAllen Holdings, Inc. and Richard A. Frueh should be dismissed for lack of personal jurisdiction" and that "[a]ll of Plaintiffs' claims against GunnAllen Holdings, Inc. also should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiffs have failed to state a claim against it." (*See id.*)

## **DISCUSSION**

In their First Amended Complaint, the plaintiffs enumerate a variety of claims against the defendants. (*See* Docket No. 15 at 18-25.) Among these claims are one class action claim and five non-class ones. (*See id.*)

A dispute between the parties has arisen as to the proper mechanism for addressing the latter claims, *i.e.*, whether they should be sent to arbitration or resolved in this court. The plaintiffs do not dispute the defendants' assertion that they "entered into various agreements with GunnAllen Financial containing provisions requiring them to arbitrate controversies that may arise between them and GunnAllen Financial concerning any transaction or GunnAllen Financial's business." (*See* Docket No. 23 at 3.) Rather, the plaintiffs focus on the meaning behind the section of these agreements that pertains to class actions. They recite a version of this section that reads as follows:

> No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action*; or who is a member of a putative class action* who

> has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court.

(*See* Docket No. 31 at 4 (emphasis added).)

The plaintiffs argue that this language "preclude[s] defendants from compelling arbitration with respect to the plaintiff's non-class claims." (*See id.*) Specifically, they maintain that "the use of a semicolon . . . as well as the word 'or' following the semicolon . . . requires the conclusion that the subsequent phrase 'with respect to any claims encompassed by the putative class action' modifies only the phrase 'who is a member of a putative class who has not opted out of the class.'" (*See id.* at 12.) In other words, the plaintiffs assert that all of their claims are free from arbitration because each of them "is a person who has initiated in court a putative class action." (*See id.*)

The defendants cite a different version of this section that does not include the "; or who is a member of a putative class action" portion of the plaintiffs' recitation:

> No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class who has not opted out of the <u>class with respect to any claims encompassed by the putative class action</u> until (I) the class certification is denied; or (II) the class is decertified; or (III) the customer is excluded from the class by the court . . . .

(*See* Docket No. 23 at 13 (emphasis in original).)

To the defendants, "Plaintiffs' semicolon argument is nonsensical." (*See* Docket No. 35 at 5.) They argue that, regardless of how the court decides to treat the plaintiffs' class claims, the language above requires it to "compel Plaintiffs' individual claims to arbitration." (*See* Docket No. 23 at 13.)

The variation in the language cited by the parties appears to stem, at least in part, from

4

the fact that the plaintiffs, throughout the years they did business with GunnAllen Financial, signed a number of different agreements that, at some times, contained the language they now recite in their pleadings and, at others, contained the language the defendants now quote. (*Compare* Docket No. 27, Ex. Part 1 at 11-12 (Beasley Medallion Account Agreement, signed July 10, 2002, reflects the language cited by the plaintiffs) *with* Docket No. 27, Ex. Part 1 at 15- Exhibit Part 2 at 1 (Beasley Option Agreement and Approval Form, signed March 31, 2004, reflects the language cited by the defendants).)

The defendants assert that "the most recent arbitration agreements . . . between each of the named Plaintiffs and GunnAllen Financial" all contain the language they recite.[1] (*See* Docket No. 23 at 13.) The plaintiffs do not address this discrepancy, although they do indicate that the language reflected in their version of the agreement is that required by NASD Conduct Rule 3110(f)(6). (*See* Docket No. 31 at 6.) While the defendants are NASD members (*see* Docket No. 23 at 1 n.1), the plaintiffs "are not NASD members and are not bound by the NASD's conduct rules" (*see* Docket No. 31 at 14). Accordingly, the plaintiffs claim, "the only issue here is what the parties intended by the language in their agreements." (*See id.*)

The court need not determine, for the purposes of this analysis, which version of the agreements controls here with respect to each of the plaintiffs. As discussed below, even under the version of the agreement put forth by the plaintiffs, which presents a closer question as to

---

[1]An examination of the defendants' submission of what appear to be the most recent arbitration agreements signed by the plaintiffs reveals that most, but not all, of these agreements do reflect the language put forth by the defendants. (*Compare* Docket No. 27, Ex. Part 1 at 7 (appears to be most recent arbitration agreement signed by Gene and Frances Cannon and reflects the language cited by defendants) *with* Docket No. 27, Ex. Part 12 at 10 (7 (appears to be most recent arbitration agreement signed by Stephen and Donna Hughes and reflects the language cited by plaintiffs).)

5

whether the plaintiffs' non-class claims should be compelled to arbitration while the class ones remain in this court, the court finds that the plaintiffs' non-class claims are suitable for arbitration.

**I.      In accordance with Sixth Circuit precedent, non-class claims may be sent to arbitration, despite the fact that they were brought along with nonarbitrable class claims, as long as they are not encompassed by those class claims.**

This court has previously outlined–but not decided–the question in this case, *i.e.*, whether non-class claims may be sent to arbitration when they are brought by a plaintiff who also asserts nonarbitrable class claims. *See French v. First Union Secs.*, 209 F. Supp. 2d 818, 833 (M.D. Tenn. 2002) (indicating Judge Nixon's determination that "this is a difficult issue which, thankfully [due to his dismissal of the underlying class claims], this Court need not fully resolve").

The Sixth Circuit in 2005 provided important guidance as to the resolution of this issue when it emphasized that the "plain meaning" of another portion of the NASD regulations, which contains language that is somewhat similar to the plaintiffs' version of the class action non-arbitration clause, "is that arbitration is precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group v. Capwill*, 148 Fed. App'x 413, 417 (6th Cir. 2005) (interpreting NASD Rule 10301(d)(2), which states that "any claim filed by a member or members of a putative or certified class action is . . . ineligible for arbitration at [the NASD] if the claim is encompassed by a putative or certified class action"). That same year, it also indicated that a claim arising from the same factual underpinnings as one bound for arbitration need not also be arbitrated based on this factual

6

commonality. *See Simon v. Pfizer Inc.*, 398 F.3d 765, 776 (6th Cir. 2005) (declining to send a claim to arbitration where it overlapped factually with another arbitrable claim, yet had an independent legal basis).

Notably, the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. § 9 (2000)). "[T]he mere presence in a suit of . . . non-arbitrable claims . . . will not defeat enforcement under the Act . . . regarding those claims which are arbitrable." *S. Elec. Health Fund v. Kelley*, 308 F. Supp. 847, 852 (M.D. Tenn. 2003) (internal quotations omitted). "While general principles of contract interpretation govern whether arbitration is appropriate, any questions or doubts should be resolved in favor of arbitration." *Third Nat'l Bank in Nashville v. Wedge Group Inc.*, 749 F. Supp. 851, 853 (M.D. Tenn. 1990) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (recognizing the "broad federal policy favoring arbitration")); *see also Simon*, 398 F.3d at 773 n.12 ("Where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (quoting *United Steelworkers of Am. v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994)).

With these principles in mind, the court finds that the plaintiffs' version[2] of the

---

[2]To also agree with the plaintiffs that the "encompassed by" language pertains only to the portion of their version of the arbitration agreement that follows the semicolon, *i.e.*, to members of the putative class who have not opted out of the class action, would be to create an

7

agreement, like the NASD rule interpreted in *Liberte Capital Group*, requires that "arbitration [be] precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group*, 148 Fed. App'x at 417. The defendants' version of the arbitration agreement is even more similar to the language considered by the Sixth Circuit in *Liberte Capitol Group* than is the plaintiffs' version. As such, the defendants' version, too, would require that "arbitration [be] precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group*, 148 Fed. App'x at 417. Thus, the court must determine whether the plaintiffs' class claim encompasses their non-class ones.

### A. The plaintiffs' non-class claims are not encompassed by their putative class action.

Here, the plaintiffs' putative class claim states that, "[b]y . . . making trades in the accounts of plaintiffs . . . after he was terminated by GunnAllen Financial, Mr. Tansil transacted business as a securities agent . . . in violation of the Tennessee Securities Act" and that "[d]efendants . . . are liable . . . for Mr. Tansil's violations . . . because [they] had the power . . . to control the activities of Mr. Tansil and because they provided material assistance to Mr. Tansil's unlawful conduct." (Docket No. 15 at 19.) The plaintiffs also assert that "GunnAllen Financial is also liable for the securities law violations of Mr. Tansil pursuant to the doctrine of *respondeat superior* . . . ." (*Id.*)

---

unworkable dichotomy under which claims brought by members of a putative class could be sent to arbitration far more often than claims brought by "any person who has initiated in court a putative class action."

The plaintiffs' non-class claims involve, among other things, the defendants' alleged fraudulent deception of them and their failure to disclose material information to them, as well as the defendants' violation of the Tennessee Consumer Protection Act, negligence, and breach of their fiduciary duties to the plaintiffs. (*See id.* at 20-24.) These claims stem from actions taken by the defendants throughout the time that Tansil was employed by GunnAllen Financial, as well as after he was fired. (*See id.*)

Remembering that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," the court finds that the plaintiffs' class claim does not encompass their non-class ones. *Mitsubishi Motors Corp.*, 473 U.S. at 626. Rather, an examination of the breadth of the individual claims in this case reveals that these claims extend far beyond the plaintiffs' putative class action, which stems only from activities following Mr. Tansil's termination. Thus, at least some of the plaintiffs' claims are suitable for arbitration.[3]

**B.    The parties have not supplied the court with the information it needs to determine which of the plaintiffs' individual claims are appropriate for arbitration.**

---

[3] The plaintiffs base their entire argument in favor of resolving their non-class claims outside of arbitration on the notion that such is mandated by the class action-related language in the parties' arbitration agreement. (*See* Docket No. 31 at 3-4, 11-17.) They do not otherwise assert that their non-class claims somehow fall outside the scope of the parties' agreement that "all controversies between the Plaintiff[s] and GunnAllen Financial arising out of any transaction between them, or GunnAllen Financial's business, shall be submitted to arbitration." (*See* Docket No. 27 at 2.)

9

The following individuals are plaintiffs in this case: Gene and Francis Cannon, Russell and Marie Beasley, Roger and Rachel Parker, James and Sylvia Parker, Jerry Vogel, Richard S. Graham, Carolyn Curt, Sam Finney, James C. Elliott, Chad and Marilyn Meadow, John and Andrea Moore, Stephen and Donna Hughes, and James V. Pinkston. (*See* Docket No. 15 at 5-15.) GunnAllen Financial, Inc., GunnAllen Holdings, Inc., Richard Frueh, Marc Ellis, Richard Nummi, and Stephen Saunders are all listed as defendants. (*See id.* at 2-3.)

As indicated previously, each of the plaintiffs listed above signed at least one arbitration agreement in connection with their transactions with Tansil and GunnAllen Financial. The defendants maintain that "[t]he individual defendants are entitled to invoke arbitration even though they did not sign the agreements." (*See* Docket No. 23 at 13 n.7 (citing *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990) (cautioning that, if a party "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as defendants in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified") (internal quotation omitted)).) In connection with these arguments, the defendants have submitted a wide variety of the plaintiffs' signed agreements and portions thereof. The plaintiffs, who devote the bulk of their arguments on this topic to the now-rejected assertion that no claim in this case should go to arbitration, neither state an opinion as to whether their arbitration agreements require them to arbitrate each of their non-class claims against each of the defendants here nor offer the most recent versions of their arbitration agreements.

The Supreme Court has emphasized that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *United Steelworkers of*

10

*Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  The Court has made clear that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide."  *Howsam*, 537 U.S. at 84.  In making this decision, courts "should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  An exception to courts' general power to make this determination, however, arises where there exists "clear and unmistakable evidence" that the parties agreed to submit such questions to an arbitrator.  *See First Options of Chicago, Inc.*, 514 U.S. at 944.

      The parties have not supplied the court with the information it needs to determine (1) whether there exists "clear and unmistakable evidence" that the parties agreed to arbitrate "question[s] of arbitrability"; or (2) presuming that such evidence does not exist, whether the arbitration agreements encompass all of the plaintiffs' non-class claims and each of the defendants they have listed.   Simply put, the court cannot decipher which of the many arbitration agreements submitted by the defendants provides the controlling arbitration language with respect to each of the plaintiffs.

      The defendants have submitted a number of different types of agreements for many of the plaintiffs.  (*See, e.g.*, Docket No. 27, Ex. Part 6 at 8-9 (Vogel Option Agreement and Approval Form, signed approximately April 6, 2004); Docket No. 27, Ex. Part 7 at 5-6 (Vogel Roth IRA Adoption Agreement, signed March 31, 2004).)  Many of these agreements contain varying language about which parties are required to arbitrate their disputes and which disputes must be sent to arbitration.  (*See, e.g., id.*)

      In addition, some of what appear to be the plaintiffs' most recent agreements contain

11

arbitration language that differs from that in the most recent agreements of their cohorts. (*Compare* Docket No. 27, Ex. Part 15 at 4-5 (Pinkston IRA Adoption Agreement, signed Sept. 27, 2004) *with* Docket No. 27, Ex. Part 9 at 7-8 (Elliott Option Agreement and Approval Form, signed May 28, 2004).) Finally, no arbitration language at all is available for one of the plaintiffs. (*See* Docket No. 27, Ex. Part 8 at 14-15 (Finney New Account Form).)

While the court has determined that, as a general rule, the plaintiffs' non-class claims are appropriate for arbitration, it needs clearer information from the parties in order to determine which of these claims fall under the agreements and which of the parties are bound by them. Specifically, the court requests that both the plaintiffs and the defendants submit what they maintain are the controlling arbitration agreements as to each of the plaintiffs. Further, they shall brief the following points: (1) whether, under each of these agreements, it is for the court to decide which parties are bound by the agreements, *see First Options of Chicago, Inc.*, 514 U.S. at 944; (2) which parties are bound by the controlling arbitration agreements, assuming that such a decision is appropriate for the court; and (3) which of the plaintiffs' non-class claims fall under the rubric of these agreements.

Upon receipt of these submittals, the court, if appropriate, will make a determination as to which of the plaintiffs' non-class claims will be sent to arbitration, and against which parties that arbitration will take place.

**II.     The plaintiffs' class claim will be stayed in this court pending the resolution of the non-class claims that proceed to arbitration.**

The defendants have dedicated a significant portion of their pleadings to the argument

12

that the plaintiffs' class claim must fail because it cannot survive Rule 23 analysis. (*See* Docket No. 23 at 6-14.) The plaintiffs make no effort to refute the defendants' arguments but, instead, claim that "at this stage, plaintiffs' class claims are to be tested by the standards of Rule 12(b)(6), not by the standards of Rule 23." (*See* Docket No. 31 at 1.)

"[A]t an early practicable time" after the commencement of a class action, a court is required to conduct a "rigorous analysis" into whether the requirements of Rule 23 have been met, such that class certification is appropriate. *See* Fed. R. Civ. P. 23(c)(1); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). In order for a class to be certified under Rule 23, the plaintiffs must first establish the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998). Once they have met these requirements, the plaintiffs must also demonstrate that the class should be certified under at least one of the three categories of class actions described in Rule 23(b). *See* Fed. R. Civ. P. 23(b); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079.

The Sixth Circuit has emphasized that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (quoting *Falcon,* 457 U.S. at 160). It has also noted that "ordinarily the [class certification] determination should be predicated on more information than the pleadings will provide" and that "[t]he parties should be afforded an opportunity to present evidence on the maintainability of the class action." *See In re Am. Med. Sys., Inc.*, 75 F.3d at

13

1079 (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)). Indeed, Rule 23 itself was modified in 2003 to reflect the reality that "[t]ime may be needed to gather information necessary to make the certification decision." *See* Fed. R. Civ. P 23(c)(1)(A) advisory committee's 2003 note.

In this court, the certification decision is invariably made on the basis of a fully briefed motion for class certification, the timing of which is usually set at the initial case management conference (which has not yet been held in this case). The pleadings do not provide the court with the detailed information it needs to conduct the requisite, "rigorous" Rule 23 analysis. *See Falcon*, 457 U.S. at 161. Indeed, the plaintiffs have not even submitted argument pertaining to whether they are able to meet the Rule's requirements. Without more information, the court is unable to decide, at this point, whether class certification is appropriate.[4]

Additionally, the resolution in arbitration of the plaintiffs' non-class claims may affect

---

[4]For instance, the court does not have enough information to determine whether the plaintiffs' putative class is so numerous that the joinder of all of its members would be impracticable. In analyzing joinder impracticability, the court should consider the number of class members, their geographical dispersion, whether they are identifiable, their fear of harassment, and the size of their claims, as well as judicial efficiency and whether the class action is injunctive in nature. *See* Alba Conte & Herbert Newberg, Newberg on Class Actions §§ 24:16-18 (4th ed. 2003); *see also Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 286 (W.D. Mich. 2001).

The plaintiffs have alleged only that "there are more than fifty members of the Plaintiff Class." (*See* Docket No. 15 at 16.) While they have provided geographic information as to the approximately twenty named members of the current class, they have not indicated the location of the remaining members, nor have they discussed a number of the other numerosity factors. (*See id.* at 5-15.) While the relatively small number of plaintiffs here does not necessarily preclude the certification of their case as a class action, the court must carefully consider the other factors that define the numerosity inquiry in order to determine if such is appropriate. *See In re Am. Med. Sys.*, 75 F.3d at 1076 (recognizing that "the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement") (citing *Afro Am. Patrolmen's League v. Duck*, 75 F.3d 1069, 1076 (6th Cir. 1974)). It cannot do so here without more information.

14

the composition of their putative class. While the plaintiffs seek "recissionary damages, plus interest and attorney's fees" through their class action, they hope to recover the same from some of their non-class claims. (*See, e.g,* Docket No. 15 at 20 (listing plaintiffs' class action damages), 21 (seeking the same damages, among other things, via Count One of plaintiffs' non-class claims).) Because "[i]t goes without saying that the courts can and should preclude double recovery by an individual," this court must prevent plaintiffs who recover via their individual claims everything they seek in their class ones from pursuing their class claims in this court. *See Liberte Capital Group*, 148 Fed. App'x at 417 (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)). The Sixth Circuit has recognized the power of district courts, when confronted with class action claims whose individual counterparts are being arbitrated, to take steps to ensure that double recovery does not occur. *See Liberte Capital Group*, 148 Fed. App'x at 417 ("We are convinced that . . . the district court is quite capable of ensuring that no double recovery occurs should [plaintiffs pursuing both individual and class claims] eventually prevail in the arbitration."). Thus, the plaintiffs' class claims will be stayed in this court pending the resolution of their non-class claims in arbitration.[5]

## CONCLUSION

---

[5] As noted above, the defendants have moved to dismiss all of the plaintiffs' claims against Richard Frueh for lack of personal jurisdiction and against GunnAllen Holdings for lack of personal jurisdiction and failure to state a claim. (*See* Docket No. 22 at 1.) If these defendants are bound by the arbitration agreements and the plaintiffs, in arbitration, recover all of the damages they seek against them, any decision by the court on these motions would be rendered moot. *See Liberte Capital Group*, 148 Fed. App'x at 417 (noting that courts "can and should preclude double recovery by an individual"). As such, these motions by the defendants will also be stayed pending the resolution of any claims heard against them in arbitration.

15

Although the court finds that the plaintiffs' class claim does not encompass their non-class ones and that, as such, some of their non-class claims must be arbitrated pursuant to their arbitration agreements, the parties have not provided the court with the information it needs to determine the particular claims that are appropriate for–and the particular parties that will be bound by–this arbitration.  The defendants' motion to dismiss plaintiffs' non-class claims from this court and to compel them to arbitration will be stayed pending the court's receipt of this information from the parties.  In addition, the plaintiffs' class claims, which will remain in this court pursuant to their arbitration agreements, will be stayed pending the resolution of the non-class claims that proceed to arbitration.  Finally, the defendants' motions to dismiss all of the plaintiffs' claims against Richard Frueh for lack of personal jurisdiction and against GunnAllen Holdings for lack of personal jurisdiction and failure to state a claim will be stayed pending the resolution of any claims heard against these defendants in arbitration.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge