# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **GENE AND FRANCES CANNON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:06-0804** |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **GUNNALLEN FINANCIAL, INC.**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the Defendants' Motion to Dismiss (Docket No. 74), to which the plaintiffs have responded (Docket No. 76-1), and the defendants have replied (Docket No. 77-1). For the reasons discussed herein, the defendants' motion will be granted in part and denied in part.

## FACTS and PROCEDURAL HISTORY

As noted in the court's previous opinions, the claims in this case stem from the plaintiffs' dealings with P. Michael Tansil, a stockbroker who, when the plaintiffs first encountered him, was a registered representative of GunnAllen Financial. (*See* Docket No. 15 ¶ 8.) In the section of their Amended Complaint that pertains to their class claim, the plaintiffs allege that Tansil conducted trading in the plaintiffs' accounts at a time when he was not legally allowed to do so, i.e., after GunnAllen Financial had fired him. (*See id.* ¶¶ 14, 95-96.) As such, the plaintiffs claim, they are entitled to rescissionary damages with respect to each of the securities

transactions that Tansil effected in their accounts during that time.  (*See id.* ¶ 97.)  They bring

their claims against not only GunnAllen Financial, but also (1) GunnAllen Holdings, the

corporation that owns GunnAllen Financial; (2) Richard Frueh, the Chairman and CEO of

GunnAllen Financial; (3) Marc Ellis, GunnAllen's Chief Compliance Officer since July 2005;

(4)  Richard Nummi, the Chief Compliance Officer of GunnAllen Financial until July 2005; and

(5)  Stephen Saunders, who was Tansil's direct supervisor from January 2002 until August 2005.

(*See id.* ¶¶ 2-7.)

On September 18, 2006, the defendants moved to dismiss all of the plaintiffs' claims and

to compel those claims to arbitration pursuant to the plaintiffs' arbitration agreements.  (*See*

Docket No. 22 at 1.)  On January 22, 2007, this court found that the plaintiffs' individual claims

were generally appropriate for arbitration and stayed the defendants' Motion to Dismiss and to

Compel Arbitration pending the parties' submission of additional information.  (*See* Docket No.

48 at 12.)  The court also stayed the plaintiffs' class claim pending the resolution of their

individual claims in arbitration.  (*See id.*)

On February 5, 2007, the parties filed a Stipulation Concerning Arbitration that stated,

among other things, their agreement as to which of the plaintiffs' claims should be arbitrated and

which defendants would participate in the arbitration.  (*See* Docket No. 50 ¶¶ 3-5.)  The court

subsequently ordered that, pursuant to this stipulation, each of the plaintiffs' individual claims

would be compelled to arbitration before the National Association of Securities Dealers

("NASD").  (*See* Docket No. 52 ¶ 3.)  As recognized by both parties and reflected in the court's

Order, however, the plaintiffs' class claims were to remain in this court.  (*See id.* ¶ 2.)

The plaintiffs then moved the court to reconsider its stay of their class claims or to allow

the three plaintiffs without individual claims to proceed to a separate trial of their class claims.

(*See* Docket No. 51 at 2.) The court denied that motion on March 9, 2007. (*See* Docket No. 64 at 1.)

The defendants now move to dismiss from this court the plaintiffs' class claim. (*See* Docket No. 74 ¶¶ 1-3.) In support of this motion, they assert both that this court lacks jurisdiction over two of the defendants and that the plaintiffs' class claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See id.* ¶¶ 1-2.) The defendants' 12(b)(6) arguments will be addressed first.

## I.      The defendants' motion to dismiss for failure to state a claim

The plaintiffs seek to hold the defendants[1] responsible for Tansil's wrongs under two separate theories. First, they assert that the defendants are liable under the Tennessee Securities Act ("TSA"), either as "controlling persons" of Tansil or as ones who provided Tansil with "material aid." (*See* Docket No. 15 ¶ 98 (citing Tenn. Code Ann. § 48-2-122(g) (2005) ("§ 48-2-122(g)").) Second, they allege that GunnAllen Financial is liable for Tansil's violations of the TSA pursuant to the doctrine of respondeat superior and apparent authority. (*See id.* ¶ 99.)

The defendants argue that they cannot be liable under the TSA because they neither controlled Tansil nor provided him with material aid. (*See* Docket No. 75-1 at 5-12.) Further, they assert that the plaintiffs cannot hold GunnAllen Financial responsible via respondeat superior or apparent authority because the TSA "does not provide for secondary liability . . . ." (*See id.* at 12.)

---

[1]Because the plaintiffs concede that both GunnAllen Holdings, the corporation that owns GunnAllen Financial, and Richard Nummi, the Chief Compliance Officer of GunnAllen Financial until July 2005, "should be dismissed from this lawsuit," the court will not address the liability of these defendants. (*See* Docket No. 76-1 at 3.)

### A.      Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will accept as true the facts as the plaintiff has pleaded them.  *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Surety Co.*, 163 F.3d 366, 369 (6th Cir. 1998).  The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test."  *Scheuer*, 416 U.S. at 236.  Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

Earlier this year, in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007), the Supreme Court, in the context of an antitrust case, readdressed the pleading requirements under the Federal Rules.  Specifically, the Court reconsidered the long-held dictum that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 1968 (quoting *Conley*, 355 U.S. at 45-46).  The Court rejected a literal reading of the "no set of facts" rule, under which "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id*.  Instead, the Court stressed

that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by conclusory assertions. *Id.* at 1965 n.3. Accordingly, the Court concluded that the "no set of facts" language, "after puzzling the profession for 50 years . . . has earned its retirement." *Id.* at 1969. "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965; *see also*, *Swierkiewicz,* 534 U.S. at 508, n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely"). With this new standard in mind, the court turns to an analysis of the defendants' motion.

**B.      The defendants' liability under the TSA**

The TSA imposes secondary liability on "persons" who "directly or indirectly . . . control any person liable under any provision of the securities laws," as well as "every broker-dealer or agent who materially aids in the act or transaction constituting the violation."[2] § 48-2-122(g); *Nichols v. Merrill Lynch*, 706 F. Supp. 1309, 1348 (M.D. Tenn. 1989) (citing § 48-2-122(g)). The Tennessee Supreme Court has noted that the TSA "should be interpreted to effectuate its general purpose to protect investors and to coordinate the interpretation and administration of this Act with related federal and state regulation." *See King v. Pope*, 91 S.W.3d 314, 322 (Tenn. 2002).

### 1.      The defendants' liability as control persons

The parties have not cited–nor has the court's research revealed–any case that interprets in detail the TSA's "control person" provision.  (*See* Docket No. 75-1 at 6 ("There are no reported cases that analyze control person liability under the Tennessee Securities Act.").)  The plaintiffs assert that "[i]t is plainly irrelevant under this statutory language whether, or to what extent, the controlling person was actually involved in the business of the wrongdoer.  The statutory test is the 'power' to control."  (*See* Docket No. 76-1 at 6.)  They claim that, under this standard, the defendants qualify as control persons because, "[o]bviously, GunnAllen Financial

---

[2]The TSA defines "person" as "a natural person . . . or corporation, a partnership, an association, a limited liability company, a joint-stock company . . . or any other unincorporated organization."  *See* Tenn. Code. Ann. § 48-2-102(13) (2005).  It defines "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others, or any person engaged in the business of buying or selling securities issued by one . . . or more other persons for such person's own account and as part of a regular business . . . ."  *Id.* § 48-2-102(4).

had the power to control the ability of anyone, including Mr. Tansil, to effectuate trades in GunnAllen Financial accounts." (*See id.*) Additionally, they note that "Defendant also had control over those of its employees who allowed Mr. Tansil to indirectly make trades in GunnAllen accounts." (*See id.*) Finally, they assert that "GunnAllen Financial clearly had the power to prevent the unlawful trading that gives rise to plaintiffs' claims [because t]he power to stop someone from engaging in conduct is the power to control that person with respect to the conduct in question." (*See id.* at 7.)

The defendants, who rely on Sixth Circuit interpretations of federal securities laws, counter that "it is not enough to plead the potential to control, a plaintiff must also plead that the defendant actually exercises control over the primary violator." (*See* Docket No. 75-1 at 6.) According to the defendants, "Mr. Tansil cannot be held to have been unregistered as a result of his termination from GunnAllen (and thus in violation of [the TSA] for trading while unregistered) and simultaneously claim that GunnAllen Financial should be liable as a control person because Tansil was a broker under their control."[3] (*See id.* at 6-7.) Additionally, the defendants assert that the plaintiffs have not alleged that any of the other defendants exercised control over Tansil during the time when Tansil's alleged violations took place. (*See id.* at 7-8.)

_____

[3]Although the defendants refer to Tansil's TSA violations as "alleged" and "supposed," they do not directly dispute, for the purposes of their Motion to Dismiss, that Tansil violated Section 48-2-109 of the TSA when he effected trades in the plaintiffs' accounts after GunnAllen Financial had terminated him for cause, which resulted in Tansil no longer being registered to sell securities in Tennessee. (*See* Docket No. 15 ¶ 15; Docket No. 75-1 at 1 (explaining that, after Tansil was terminated, his registration became ineffective); *id.* at 5, 7 (arguing not about whether Tansil effected the trades in the plaintiffs' accounts but, instead, about whether the defendants could be held liable for Tansil's actions)); *see also* Tenn. Code. Ann. § 48-2-109(a) ("It is unlawful for any person to transact business from or in this state as a broker-dealer or agent unless such person is registered as a broker-dealer or agent under this part . . . ."); *id.* § 48-2-109(b) ("The registration of an agent is not effective during any period when the agent is not associated with a particular broker-dealer registered under this part.").

The section of the TSA that pertains to control person liability reads as follows: "Every person who directly or indirectly controls a person liable under this section . . . [is] also liable jointly and severally with and to the same extent as such person." *See* § 48-2-122(g).  As the defendants note, this section is substantially similar to the Securities and Exchange Act of 1934, 15 U.S.C. § 78(t) (2006) (§ 78(t)).  Indeed, the relevant section of that Act states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable with and to the same extent as such controlled person."[4] *See* § 78(t).

While courts have not yet interpreted Section 48-2-122(g), the control person provision of the TSA, they have analyzed Section 78(t), its arguable federal counterpart.  In one case, the Sixth Circuit held that a finding of control person liability required, at a minimum, a demonstration "that the defendant . . . actually participated in (i.e., exercised control over) the operation of the . . . violator[] in general and that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *See Sanders Confectionary Prods. v. Heller Fin., Inc.,* 973 F.2d 474, 486 (6th Cir. 1992) (internal quotation omitted).  Chief Judge Campbell of this district accurately translated this holding into a three-part test when he held that, "to state a claim for control person liability, the Plaintiffs must, at a minimum, plead facts to establish three essential elements: (1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is

_____

[4]The definitions of "control" in the TSA and in the Securities and Exchange Act ("SEA") are nearly identical.  *See* Tenn. Code Ann. § 48-2-102(7) ("'[c]ontrol' . . . means the possession, directly or indirectly, of the power to direct or compel the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise"); 17 C.F.R. § 240.12b-2 ("'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise").

predicted; and (3) actual participation (i.e., exercise control) in the operations of the primary violator in general." *See In re Prison Realty Secs. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000).

Although the court recognizes that "state and federal regulations serve different purposes," because "states enacted securities regulation to protect investors," while "[f]ederal securities regulations . . . were enacted to serve the broader purpose of protecting the integrity of the increasingly nationalized market," it also notes the Tennessee General Assembly's directive that the TSA should be interpreted to, among other things, "coordinate the interpretation and administration of this Act with related federal . . . regulation." *See King*, 91 S.W.3d at 319, 322. To interpret differently language that is nearly identical could lead to marked confusion, particularly among courts tasked with applying both TSA Section 48-2-122(g) and SEA Section 78(t). *See, e.g.*, *Nichols*, 706 F. Supp. at 1348. Such would not comport with the General Assembly's directive. Additionally, lending the control person portion of Section 48-2-122(g) the same meaning as the control person provision of Section 78(t) does not appear to undermine the TSA's ability to protect investors. As such, this court will interpret the TSA's control person provision in the same manner as the Sixth Circuit would require it to interpret Section 78(t) of the Securities and Exchange Act ("SEA"), i.e., it will analyze whether plaintiffs seeking to state a claim under Section 48-2-122(g) have alleged (1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual participation (i.e., exercise control) in the operations of the primary violator in general. *See In re Prison Realty Secs. Litig.*, 117 F. Supp. 2d at 692.

First, a determination must be made as to whether the plaintiffs have properly put forth allegations that "raise a right to relief above the speculative level" with respect to each of the

elements of their control person claims against each of the remaining defendants.  *See Twombly*, 127 S. Ct. at 1964-65.  The plaintiffs allege that Tansil committed the primary TSA violations when he traded in the plaintiffs' GunnAllen accounts, despite no longer being "legally permitted" to do so because GunnAllen had terminated him.  (*See* Docket No. 15 ¶ 15-16.)  They have, accordingly, appropriately addressed the test's first element.  Thus, the court will analyze only whether the plaintiffs have alleged that GunnAllen Financial, Richard Frueh, Marc Ellis and Stephen Saunders, as the remaining defendants, also (1) had the power to control the "specific transaction or activity upon which the primary violation is predicated," i.e., the trades that Tansil effected in the plaintiffs' GunnAllen accounts following his termination from GunnAllen Financial; and (2) actually exercised control of Tansil's operations in general.  *See In re Prison Realty Secs. Litig.*, 117 F. Supp. 2d at 692.

The plaintiffs have incorporated into their class claim only some of their Amended Complaint's factual assertions.[5]  (*See* Docket No. 15 ¶ 95 ("Plaintiffs incorporate herein paragraphs 1-7, 10, 14-16, and 83-93 . . . .").)  A thorough review of these assertions, as well as those that specifically accompany the plaintiff's class claim, reveals the plaintiffs' failure to

---

[5]The defendants assert–and the plaintiffs do not dispute–that the plaintiffs made the calculated decision to exclude from their class claim some of the factual assertions alleged in their Amended Complaint because "if such allegations are material and necessary, a class cannot be certified as individual issues will predominate over common issues."  (*See* Docket No. 75-1 at 10.)  The court notes that, in their original Complaint, the plaintiffs did incorporate some of the now-excluded allegations into their class claim.  (*See, e.g.,* Docket No. 1, Ex. A, Original Complaint ¶ 89 (incorporating paragraphs eighteen and nineteen, which include allegations that, when "some" of the plaintiffs asked Tansil and James Benjamin Leyhew, the GunnAllen Financial staff person whose name replaced Tansil's on their monthly account statements, who was handling their accounts, the plaintiffs "were told that [Leyhew] was not really handling their accounts and that Mr. Tansil was still doing so.").)  The court thus infers that the plaintiffs made a deliberate decision to exclude these facts from their class claim in their Amended Complaint, likely for class certification-related reasons.

allege that any of these defendants actually exercised control over Tansil's general operations following Tansil's 2005 termination from GunnAllen Financial. (*See id.* ¶¶ 1-7, 10, 14-16, 83-100.) Indeed, the plaintiffs allege only that the defendants "had the power, directly or indirectly, to control the activities of Mr. Tansil." (*Id.* ¶ 98; *see also* Docket No. 76-1 at 8 (asserting that the individual defendants had power over Tansil by virtue of their positions of authority within GunnAllen Financial).)

While the plaintiffs' Opposition to Defendants' Motion to Dismiss also includes the assertion that "defendants exercised actual control over those persons whose duty it was to prevent Mr. Tansil from having the ability to effect trades in the plaintiffs' accounts," the defendants correctly note that "under the plain terms of the secondary liability provisions of the TSA, Plaintiffs must allege that Defendants had control over the primary violator, Mr. Tansil." (*See* Docket No. 76-1 at 8 n.3 (plaintiffs' assertion); Docket No. 77-1 at 1 (defendants' argument that "it is wholly irrelevant whether GunnAllen had control over its current employees")); *see also* Section 48-2-122(g) (imposing secondary liability on "[e]very person who directly or indirectly controls a person liable under this section"). The plaintiffs also assert in their brief that "Defendants exercised actual control over Mr. Tansil at least up until his termination in August 2005." (*See* Docket No. 76-1 at 8 n.3.) This, too, is irrelevant, as Tansil's alleged TSA violations–and thus, any third-party liability for them–did not occur until after Tansil's termination.

Because the plaintiffs have not alleged that GunnAllen Financial, Freuh, Ellis, or Saunders actually exercised control over Tansil's general operations at the relevant time, and because such an allegation is a necessary component of a "control person" claim under the TSA, the defendants' Motion to Dismiss will be granted as to the liability of these defendants on this

claim.

### 2. Whether the defendants provided Tansil with material aid

Under the TSA, "every broker-dealer or agent who materially aids in the transaction constituting the violation [is] also liable jointly and severally with and to the same extent as [the primary violator.]" *See* § 48-2-107(g).  As with the TSA's control person provision, the parties have not cited–nor has the court's research revealed–any cases that analyze this statutory language.  (*See* Docket No. 75-1 at 10 (noting that "there does not appear to be any case that sets forth the standard of "materially aids" under the Tennessee Securities Act").)  Although the plaintiffs do not offer a definition of "material aid," the defendants suggest that such aid "requires allegations of a substantial causal connection between the culpable conduct of the alleged aider and the harm to the plaintiff."  (*See id.*)

In light of the dearth of Tennessee cases interpreting this phrase, this court looks to the decisions of courts in other states that have "material aid" provisions nearly identical to that found in the TSA.  Although these decisions do not provide a concrete definition of "materially aid," they do illuminate the phrase's meaning.  For instance, the Supreme Court of Connecticut found that "aid is 'material' if it has a natural tendency to influence, or was capable of influencing, the decision of the purchaser."[6]  *See Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101,

_____

[6]The *Giacomi* court was interpreting a Connecticut statute that read as follows:

Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally

12

121-22 (Conn. 1997). The Oregon Supreme Court noted that the existence of material aid "depends on the importance of one's personal contribution to the transaction."[7] *See Prince v. Brydon*, 764 P.2d 1370, 1371 (Or. 1988). That court further explained the following: "Whether one's assistance in the sale is 'material' does not depend on one's knowledge of the facts that make it unlawful; it depends on the importance of one's personal contribution to the transaction. Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale." *Id.*; *see also Brown v. Earthboard*

---

with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

*See Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101, 107 (Conn. 1997) (quoting Conn. Gen. Stat. § 36-498(c) (1993) (current version at Conn. Gen. Stat. § 36b-29(c) (2004))).

[7]The Oregon statute is similar, although not identical, to Section 48-2-122(g):

Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, limited liability company manager, including a member who is a manager, officer or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with that person.

Or. Rev. Stat. § 59.115(3) (2003).

*Sports USA, Inc.*, 481 F.3d 901, 922 (6th Cir. 2007) (finding that, under Kentucky law,[8] an

investment firm did not materially aid in the improper sale or purchase of a security, where an

independent contractor used the firm's office equipment to effect improper trades); *Hirata Corp.*

*v. J.B. Oxford & Co.*, 193 F.R.D. 589, 600 (S.D. Ind. 2000) (finding that, under Indiana law,[9]

those who merely perform "ministerial functions" do not provide material aid).

Such decisions also help to reveal what "material aid" is not. For instance, the Alabama

---

[8]The Kentucky statute that the Sixth Circuit analyzed in *Brown* is similar to Section 48-2-122(g):

> Every person who directly or indirectly controls a seller or purchaser liable under subsection (1) or (2) of this section, every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Ky. Rev. Stat. § 292.480(4) (2006).


[9]The Indiana statute at issue in *Hirata Corp.* is similar to Section 48-2-122(g):

> A person who directly or indirectly controls a person liable under subsection (a), (b), or (c), a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating the liability, and a broker-dealer or agent who materially aids in the conduct are also liable jointly and severally with and to the same extent as the person, unless the person who is liable sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons liable.

Ind. Code § 23-2-1-19(d) (2005).

14

Supreme Court, tasked with interpreting Alabama's material aid provision,[10] found that the argument "to the effect that [a defendant's] activities must be a 'substantial factor' in [an improper sale of securities] is misplaced." *See Foster v. Jesup & Lamont Secs. Co.*, 482 So. 2d 1201, 1207 (Ala. 1986) (holding that a jury was justified in finding that a defendant had materially aided an improper securities sale, despite the fact that the Eleventh Circuit had held that the defendant's activities were not a substantial factor in the sale). In addition, the Oregon Supreme Court found that, under Oregon's material aid provision, "'participate' and 'materially aid[]' are separate concepts, not synonyms. A person may participate without materially aiding or materially aid without participating." *See Prince*, 764 P.2d at 1371.

In their Opposition to Defendants' Motion to Dismiss, the plaintiffs allege that the defendants rendered material aid to Tansil when they "[gave] Mr. Tansil access to the means to effect unlawful trades." (*See* Docket No. 76-1 at 7.) The plaintiffs further explain that "Mr. Tansil could obviously not have effectuated trades in GunnAllen Financial accounts without the assistance of GunnAllen Financial and/or its agents." (Docket No. 76-1 at 7.) Notably, the plaintiffs' Amended Complaint contains only the assertion that the defendants "provided

_____

[10]The statute considered by the Alabama Supreme Court in *Foster* is nearly identical to Section 48-2-122(g):

> Every person who directly or indirectly controls a person liable under subsections (a) or (b) of this section, including every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct is also liable jointly and severally with and to the same extent as the person liable under subsection (a) or (b), unless he is able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Ala. Code § 8-6-19 (2006).

material assistance to Mr. Tansil's unlawful conduct" and does not include any substantiating facts. (*See* Docket No. 15 ¶ 98.) The defendants counter that the plaintiffs' allegations on this point are "conclusory" and "wholly insufficient." (*See* Docket No. 77-1 at 4-5 ("No[]where in . . . their Amended Complaint[] do Plaintiffs explain or allege how any Defendant provided Mr. Tansil with access to the means to effect unlawful trades or otherwise provide[d] material assistance to Mr. Tansil's alleged unlawful trading.").

The court need not distill a rule from other courts' definitions of "material aid" because the single allegation about material aid that is contained in the plaintiffs' Amended Complaint does not suffice to meet the plaintiffs' burdens at this stage of the proceedings, regardless of the proper definition of "material aid." In *Twombly*, the Supreme Court rejected the notion that a "wholly conclusory statement of claim" could survive a motion to dismiss "whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *See Twombly*, 127 S. Ct. at 1968. The Court also noted that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65.

While the Sixth Circuit has not yet indicated whether it will apply this standard outside of the antitrust realm at issue in *Twombly*, most courts faced with the issue have found in *Twombly* no indication that the Supreme Court intended to restrict its reconsideration of the motion to dismiss standard to antitrust cases alone. *See Lee v. Dublin Manor Corp.*, No. 2:06-cv-0533, 2007 WL 2259190, at *2 (S.D. Ohio Aug. 3, 2007) (slip op.) (applying the *Twombly* standard to a case involving the Real Estate Settlement Procedures Act, 12 U.S.C. § 2608 (2006), as well as various state law claims, including claims for fraud and negligence); *LeBlanc v. Michigan*, No.

06-CV-13588-DT, 2007 WL 2225860, at *2 (E.D. Mich. Aug. 1, 2007) (slip op.) (applying the *Twombly* standard to a case involving the RICO Act, 18 U.S.C. § 1961-68 (2006)); *Peebles v. ADM S. Cellulose*, No. 1:06-CV-229, 2007 WL 2077629, at *2 (E.D. Tenn. July 17, 2007) (slip op.) (applying the *Twombly* standard to a case involving an age discrimination claim); *Reid v. Purkey*, No. 2:06-CV-40, 2007 WL 1703526, at *1-*2 (E.D. Tenn. June 11, 2007) (slip op.) (applying the *Twombly* standard to a case involving a prisoner's Eighth Amendment claim). Indeed, the Supreme Court itself recently applied this standard in the context of a pro se prisoner's Section 1983 claim. *See Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197, 2200 (2007).

Under the *Twombly* standard, the allegation in the plaintiffs' Amended Complaint does not rise to the level of detail required in *Twombly*. *See id.* at 1965 n.3 ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."). As such, the court will dismiss the plaintiffs' claim that the defendants provided Tansil with material aid in violation of Section 48-2-122(g).

### C.     Whether GunnAllen Financial is liable for Tansil's alleged violations

The plaintiffs employ the doctrines of both respondeat superior and apparent authority[11]

---

[11]The plaintiffs also refer to "implied agency" in their Amended Complaint. (*See* Docket No. 15 ¶ 99 (asserting that "Mr. Tansil was an implied or apparent agent of GunnAllen Financial"). They fail, in both their Amended Complaint and their Opposition to Defendants' Motion to Dismiss, however, to expound on their allegations that Tansil was an implied agent of

in their attempt to hold GunnAllen Financial liable for Tansil's alleged TSA violations.[12]  (*See* Docket No. 15 ¶ 99.)  Although both parties seem to co-mingle these doctrines, they are, in fact, separate theories of liability.  *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) (discussing the "three major types of agency liability": (1) the liability of a principal based on its express or implicit authorization of its agent's conduct; (2) the liability of a principal via respondeat superior; (3) the liability of a principle based on "an apparent authority theory"); Restatement (Third) of Agency Introduction (2006) ("Doctrines of . . . apparent authority . . . do not govern or explain the application of respondeat superior.  Rather, respondeat superior is based on the status created by particular types of agency relationships, chiefly employment.  The doctrine of scope of employment, although related in some basic respects to the notion of scope of authority, is distinct from the agency-law doctrines that define actual and apparent authority).  The court will address each doctrine in turn.

---

GunnAllen Financial.  Because "[t]here are important distinctions between apparent authority and implied authority," such as the fact that, "[w]hile implied authority is actual authority, apparent . . . authority is not actually possessed by the agent," the court will not analyze the existence of implied authority in the context of its discussion about apparent authority.  *See* 2A C.J.S. Agency § 140 (1972); *see also* 2 Fletcher Cyclopedia of Private Corps. § 449 (2005) ("Apparent . . . authority is authority the principal knowingly permits the agent to exercise or which the principal holds his or her agent out as possessing, although it has not actually been granted to the agent.  This is different from implied authority, which is defined as that which the principal intends an agent to possess, and which is proper, usual, and necessary to the exercise of the authority actually granted.").

[12]An underlying TSA violation by Tansil is a necessary component of the plaintiffs' attempt to hold GunnAllen Financial vicariously liable for Tansil's alleged wrongdoing.  *See Holloway v. Howerdd*, 536 F.2d 690, 695 (6th Cir. 1976) ("The use of the doctrine of respondeat superior to impose liability on [a brokerage firm] must be predicated on a finding that [the firm's agent] engaged in some illegal activity.").  The plaintiffs, in their Amended Complaint, allege that Tansil violated Section 48-2-109 of the TSA when he "directly or indirectly ma[de] trades in the accounts of plaintiffs and the Plaintiff Class after he was terminated by GunnAllen Financial."  (*See* Docket No. 15 ¶ 96.)  For the purposes of this motion, the defendants have not directly disputed these allegations.  This requirement is thus met.

### 1.    *Respondeat superior*

Under the doctrine of respondeat superior, "an employer may be held liable for the torts committed by his or her employees while performing duties within the scope of employment." *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 718 (Tenn. 2000).  In order to hold an employer liable under this doctrine, a plaintiff must demonstrate "(1) that the person who caused the injury was an employee; (2) that the employee was on the employer's business; and (3) that the employee was acting within the scope of his employment went the injury occurred." *Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992) (citing *Hamrick v. Spring City Motor. Co.*, 708 S.W.2d 383, 386 (Tenn. 1986)).  The defendants assert that the plaintiffs cannot meet their burden to demonstrate these elements because, as the plaintiffs acknowledge, Tansil was not a GunnAllen Financial employee at the time that he allegedly violated the TSA.  (*See* Docket No. 77-1 at 6; Docket No. 15 ¶ 15 (recognizing that Tansil was fired in August 2005).)

As with the other claims in this case, the parties have not cited–nor has the court's research revealed–any cases that explicitly analyze whether, under Tennessee law, an individual who has been terminated qualifies as an "employee" for the purposes of respondeat superior liability.  Although the court notes that the Sixth Circuit case cited by the defendants does not apply Tennessee law, as the defendants repeatedly assert that it does (*see* Docket No. 75-1 at 15; Docket No. 77-1 at 6), this decision is instructive.  *See Ventura v. Cincinnati Enquirer*, 396 F.3d 784, 790 (6th Cir. 2005) (applying Ohio law and holding that an employer was not liable for the acts that a former employee committed three months after his termination because  "the doctrine of respondeat superior applies only when the employee acts within the scope of his employment, a condition unmet in the instant matter").   Because the plaintiffs cannot demonstrate that Tansil

19

was a GunnAllen Financial employee at the time of his alleged TSA violations, they cannot attempt to hold GunnAllen Financial liable for these violations via respondeat superior.

## 2.  *Apparent authority*

The analysis of whether the plaintiffs have stated a claim regarding GunnAllen Financial's liability for Tansil's alleged TSA violations via the doctrine of apparent authority is necessarily more complex.  First, the court will address whether theories of agency generally may be employed to hold an entity secondarily liable for the TSA violations allegedly committed by the entity's agent.  Next, the court will consider whether the plaintiffs here have adequately alleged that Tansil was acting as an apparent agent of GunnAllen Financial.

The plaintiffs argue that vicarious liability may be imposed for securities violations.  (*See* Docket No. 76-1 at 9-10.)  The defendants counter that, "[i]n an action of *purely statutory origin*, where the statute relied upon specifically prescribes the elements of liability there[]under and names the classes of persons whose act may render them liable to its penal provisions, common-law principles may not be invoked to extend the elements of liability prescribed by the statute, nor to enlarge the classes of persons to whom its penal provisions may be applied."  (*See* Docket No. 75-1 at 13 (emphasis in original).)

Under Sixth Circuit precedent, the plaintiffs' position is the accurate one.  Indeed, the Sixth Circuit has long recognized that an entity may be vicariously liable for acts committed by its agents in violation of securities laws.  *See Holloway v. Howerdd*, 536 F.2d 690, 694-95 (6th Cir. 1976) (recognizing that "[the SEA], which also imposes liability on controlling persons, [is] not the sole measure of employer liability" and that "the controlling provisions of [the SEA] were intended to expand, rather than restrict, the scope of liability under the securities laws and

were not intended to provide an avenue of escape from liability for those who would otherwise be responsible for the acts of their employees"); *Armstrong, Jones & Co. v. SEC*, 421 F.2d 359, 362 (6th Cir. 1970) (noting that "a broker-dealer may be sanctioned for the willful violations of its agents under the doctrine of respondeat superior"). Other circuits have also recognized that common law agency and respondeat superior theories may be used to extend liability for securities law violations. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 n.27 (9th Cir. 1990) (adopting this holding and noting that, as of 1990, the First, Second, Fifth, Sixth, Eighth, and Tenth Circuits had done the same).

Although the Sixth Circuit has specifically used agency-related theories to create vicarious liability under federal securities laws, the court again recognizes the Tennessee General Assembly's directive to interpret and administer the TSA in accordance with federal regulations. *See King*, 91 S.W.3d at 322. While neither party cited–nor did the court's research uncover–any cases about the appropriateness of holding entities vicariously liable for the TSA violations of their agents, the court notes that applying these theories to state securities laws furthers the Tennessee legislature's stated intent to protect investors. *See id.* at 319. Moreover, these federal holdings have convinced courts in other states to extend liability under their own state securities laws. *See, e.g.*, *Badger v. Paulson Inv. Co.*, 803 P.2d 1178, 1182 (Or. 1991) (citing *Hollinger* and holding that theories of apparent authority could be used to extend the liability of state securities laws). This court is similarly convinced. It thus finds that a plaintiff may appropriately employ agency-related theories to hold an entity vicariously liable for the TSA violations committed by its agent.

The court now must determine whether the plaintiffs here have alleged facts sufficient to state a claim that GunnAllen Financial is liable for Tansil's TSA violations via the doctrine of

apparent authority.  To make a showing of apparent authority, a plaintiff must demonstrate that "(1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this authority to his or her detriment."  *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 421-22 (Tenn. Ct. App. 2004).

In their Amended Complaint, the plaintiffs allege that "GunnAllen Financial is . . . liable for the securities law violations of Mr. Tansil . . . because Mr. Tansil was an . . . apparent agent of GunnAllen Financial."  (*See* Docket No. 15 ¶ 99.)  By way of alleging facts pertinent to the first element listed in *Hobbs*, i.e., that GunnAllen Financial actually or negligently acquiesced in Tansil's exercise of authority, the plaintiffs assert, in their Amended Complaint, that, in the months after GunnAllen Financial terminated Tansil, he "continued to manage plaintiffs' accounts at GunnAllen Financial and made numerous trades in plaintiffs' accounts, all in violation of the [TSA]."  (*Id.* ¶ 16.)  They expound on this assertion in their Opposition to Defendants' Motion to Dismiss, wherein they argue that Tansil could not have traded in these accounts without GunnAllen Financial's acquiesce.  (*See* Docket No. 76-1 at 7 ("Mr. Tansil obviously could not have effectuated trades in GunnAllen Financial accounts without the assistance of GunnAllen Financial and/or its agents.").)  These allegations also relate to the second element listed in Hobbs, i.e., that the plaintiffs knew that Tansil was effecting trades in their accounts and had a good faith belief that he had the authority to do so.  Assuming that Tansil was, in fact, trading in the plaintiffs' accounts, one might infer that the plaintiffs were aware of these trades and were under the impression that Tansil had the authority to carry them out, just as he had in the past.  The third element listed in *Hobbs* requires the plaintiffs to allege

that the plaintiffs relied on Tansil's authority to their own detriment.  *See Hobbs*, 157 S.W.3d at 421-22.  The plaintiffs accomplish this when they allege in their Amended Complaint that each of them is entitled to "rescissionary damages . . . with respect to all securities transactions effected in their GunnAllen accounts after August 26, 2005."  (Docket No. 15 ¶ 97.)

The court finds that, although these factual assertions are not detailed,[13] they extend beyond the "formulaic recitation of the elements" found insufficient by *Twombly*.  *See Twombly*, 127 S. Ct. at 1964-65.  Accordingly, the defendants' motion to dismiss the plaintiffs' claim that GunnAllen Financial is liable for Tansil's TSA violations via the doctrine of apparent authority will be denied.

## II.     The defendants' motion to dismiss for lack of jurisdiction

The defendants, in their Motion to Dismiss, argue that this court lacks jurisdiction over both GunnAllen Holdings and Richard Frueh.  (*See* Docket No. 74 ¶ 1.)  As noted above, the plaintiffs have conceded that GunnAllen Holdings "should be dismissed from this lawsuit."  (*See*

----

[13]As previously noted, the plaintiffs have not incorporated into their class claim every factual assertion that they make in their Amended Complaint.  The court, therefore, cannot rely on these unincorporated facts when determining whether the plaintiffs have adequately alleged that Tansil was acting as an apparent agent of GunnAllen Financial.  It notes with interest, however, that a number of these facts pertain directly to the plaintiffs' apparent authority claims. (*See* Docket No. 15 ¶ 8 (asserting that "[t]he plaintiffs in this case all lost money on investments sold to them by . . . Tansil"); ¶ 11 ("GunnAllen Financial and Mr. Tansil failed to inform plaintiffs that Mr. Tansil had been terminated and failed to disclose to plaintiffs that the [New York Stock Exchange Division of Enforcement] had filed serious charges against him."); ¶ 18 (asserting that Tansil told some of the plaintiffs that, although his name had been removed from their monthly account statements, "the name change was just a formality, and . . . he was still in charge of their accounts"); and ¶ 19 (stating that, when some of the plaintiffs asked James Benjamin Leyhew, the GunnAllen Financial staff person whose name replaced Tansil's on their monthly account statements who was handling their accounts, the plaintiffs "were told that [Leyhew] was not really handling their accounts and that Mr. Tansil was still doing so.").)

Docket No. 76-1 at 3.)  Similarly, the court has now held that the plaintiffs' control person and material assistance claims, both of which included Frueh as a defendant, should be dismissed pursuant to Rule 12(b)(6).  Frueh is not named as a defendant in the plaintiffs' apparent authority claim.  Accordingly, the court need not address whether it has jurisdiction over either of these two defendants.

## CONCLUSION

For the reasons discussed above, the defendants' Motion to Dismiss will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge